**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**Filed 8/27/96**

**TENTH CIRCUIT**

_____

CARDTOONS, L.C., an Oklahoma
Limited Liability Company,

         Plaintiff - Appellee,

     v.

MAJOR LEAGUE BASEBALL
PLAYERS ASSOCIATION, an
unincorporated association,

         Defendant - Appellant.

_____

First Amendment Publishing, Inc.,
Joseph Mauro, pro se,

         Amicus Curiae.

No. 95-5006

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D. Ct. No. 93-C-576-E)**

_____

Russell S. Jones, Jr. (William E. Quirk with him on the briefs), Shughart,
Thomson & Kilroy, Kansas City, Missouri, appearing for the Appellant.

James W. Tilly (Keith A. Ward with him on the brief), Tilly & Ward, Tulsa,
Oklahoma, appearing for the Appellee.

Joseph Mauro, pro se, filed an amicus curiae brief for First Amendment
Publishing, Inc.

Before TACHA, LOGAN, and REAVLEY,[*] Circuit Judges.

TACHA, Circuit Judge.

Cardtoons, L.C., ("Cardtoons") brought this action to obtain a declaratory judgment that its parody trading cards featuring active major league baseball players do not infringe on the publicity rights of members of the Major League Baseball Players Association ("MLBPA"). The district court held that the trading cards constitute expression protected by the First Amendment and therefore read a parody exception into Oklahoma's statutory right of publicity. MLBPA appeals, arguing that (1) the district court lacked jurisdiction to issue a declaratory judgment and (2) Cardtoons does not have a First Amendment right to market its trading cards. We exercise jurisdiction pursuant to 28 U.S.C. § 1291. Because Cardtoons' First Amendment right to free expression outweighs MLBPA's proprietary right of publicity, we affirm.

---

[*]The Honorable Thomas M. Reavley, Senior Circuit Judge, United States Court of Appeals for the Fifth Circuit, sitting by designation.

## I.    Background

Cardtoons formed in late 1992 to produce parody trading cards featuring caricatures of major league baseball players. Cardtoons contracted with a political cartoonist, a sports artist, and a sports author and journalist, who designed a set of 130 cards. The majority of the cards, 71, have caricatures of active major league baseball players on the front and humorous commentary about their careers on the back. The balance of the set is comprised of 20 "Big Bang Bucks" cards (cartoon drawings of currency with caricatures of the most highly paid players on the front, yearly salary statistics on the back), 10 "Spectra" cards (caricatures of active players on the front, nothing on the back), 10 retired player cards (caricatures of retired players on the front, humorous commentary about their careers on the back), 11 "Politics in Baseball" cards (cartoons featuring caricatures of political and sports figures on the front, humorous text on the back), 7 standing cards (caricatures of team logos on the front, humorous text on the back), and 1 checklist card. Except for the Spectra cards, the back of each card bears the Cardtoons logo and the following statement: "Cardtoons baseball is a parody and is NOT licensed by Major League Baseball Properties or Major League Baseball Players Association."

A person reasonably familiar with baseball can readily identify the players lampooned on the parody trading cards. The cards use similar names,

recognizable caricatures, distinctive team colors, and commentary about individual players.  For example, the card parodying San Francisco Giants' outfielder Barry Bonds calls him "Treasury Bonds,"  and features a recognizable caricature of Bonds, complete with earring, tipping a bat boy for a 24 carat gold "Fort Knoxville Slugger."  The back of the card has a team logo (the "Gents"), and the following text:

> Redemption qualities and why Treasury Bonds is the league's most valuable player:
>
> 1.  Having Bonds on your team is like having money in the bank.
> 2.  He plays so hard he gives 110 percent, compounded daily.
> 3.  He turned down the chance to play other sports because he has a high interest rate in baseball.
> 4.  He deposits the ball in the bleachers.
> 5.  He is into male bonding.
> 6.  He is a money player.
> 7.  He has a 24-karat Gold Glove.
> 8.  He always cashes in on the payoff pitch.
>
> NOTICE: Bonds is not tax-free in all states but is double exempt.

At the end of the 1992 season, Barry Bonds was a two-time winner of the National League's Most Valuable Player award, a three-time winner of a Gold Glove award, and had just signed a six-year contract for $43.75 million, making him the highest-paid player in baseball.  Richard Hoffer, The Importance of Being Barry: The Giants' Barry Bonds is the Best Player in the Game Today--Just Ask Him, Sports Illustrated, May 24, 1993, at 13.  No one the least bit familiar with the game of baseball would mistake Cardtoons' "Treasury Bonds" for anyone

other than the Giants' Barry Bonds.  Other caricatures, such as "Ken Spiffy, Jr." of the "Mari-Nerds" (Ken Griffey, Jr., of the Seattle Mariners), are equally identifiable.

The trading cards ridicule the players using a variety of themes.  A number of the cards, including the "Treasury Bonds" card and all of the Big Bang Bucks cards, humorously criticize players for their substantial salaries.  (The irony of MLBPA's counterclaim for profits from the cards is not lost on this panel.)  Other trading cards mock the players' narcissism, as exemplified by the card featuring "Egotisticky Henderson" of the "Pathetics," parodying Ricky Henderson, then of the Oakland Athletics.  The card features a caricature of Henderson raising his finger in a "number one" sign while patting himself on the back, with the following text:

> Egotisticky Henderson, accepting the "Me-Me Award" from himself at the annual "Egotisticky Henderson Fan Club" banquet, sponsored by Egotisticky Henderson:
> "I would just like to thank myself for all I have done.  (Pause for cheers.)  I am the greatest of all time.  (Raise arms triumphantly.) I love myself.  (Pause for more cheers.)  I am honored to know me. (Pause for louder cheers.)  I wish there were two of me so I could spend more time with myself.  (Wipe tears from eyes.)  I couldn't have done it without me.  (Remove cap and hold it aloft.)  It's friends like me that keep me going.  (Wave to crowd and acknowledge standing ovation.)

The remainder of the cards poke fun at things such as the players' names ("Chili Dog Davis" who "plays the game with relish," a parody of designated hitter Chili

Davis), physical characteristics ("Cloud Johnson," a parody of six-foot-ten-inch pitcher Randy Johnson), and onfield behavior (a backflipping "Ozzie Myth," a parody of shortstop Ozzie Smith).

The format of the parody trading cards is similar to that of traditional baseball cards. The cards, printed on cardboard stock measuring 2½ by 3½ inches, have images of players on the front and player information on the back. Like traditional cards, the parody cards use a variety of special effects, including foil embossing, stamping, spectra etching, and U-V coating. Cardtoons also takes advantage of a number of trading card industry techniques to enhance the value of its cards, such as limiting production, serially numbering cases of the cards, and randomly inserting subsets and "chase cards" (special trading cards) into the sets.

After designing its trading cards, Cardtoons contracted with a printer (Champs Marketing, Inc.) and distributor (TCM Associates) and implemented a marketing plan. As part of that plan, Cardtoons placed an advertisement in the May 14, 1993, issue of Sports Collectors Digest. That advertisement tipped off MLBPA, the defendant in this action, and prompted its attorney to write cease and desist letters to both Cardtoons and Champs.

MLBPA is the exclusive collective bargaining agent for all active major league baseball players, and operates a group licensing program in which it acts as the assignee of the individual publicity rights of all active players. Since 1966,

MLBPA has entered into group licensing arrangements for a variety of products, such as candy bars, cookies, cereals, and, most importantly, baseball trading cards, which generate over seventy percent of its licensing revenue. MLBPA receives royalties from these sales and distributes the money to individual players.

After receiving the cease and desist letter from MLBPA, Champs advised Cardtoons that it would not print the parody cards until a court of competent jurisdiction had determined that the cards did not violate MLBPA' rights. Cardtoons then filed this suit seeking a declaratory judgment that its cards do not violate the publicity or other property rights of MLBPA or its members. Cardtoons also sought damages for tortious interference with its contractual relationship with Champs, as well as an injunction to prevent MLBPA from threatening legal action against Champs or other third parties with whom Cardtoons had contracted concerning the cards. MLBPA moved to dismiss for lack of subject matter jurisdiction, and counterclaimed for a declaratory judgment, injunction, and damages for violation of its members' rights of publicity under Oklahoma law.

The district court referred the case to a magistrate, who issued his Report and Recommendation in favor of MLBPA. The magistrate stated that the parody cards infringed on MLBPA's right of publicity and that, under either a trademark balancing test or a copyright fair use test, Cardtoons did not have a First

Amendment right to market its cards without a license from MLBPA. The district court initially adopted the magistrate's Report and Recommendation, <u>Cardtoons, L.C. v. Major League Baseball Players Association</u>, 838 F. Supp. 1501 (N.D. Okla. 1993), but subsequently vacated that decision and issued <u>Cardtoons, L.C. v. Major League Baseball Players Association</u>, 868 F. Supp. 1266 (N.D. Okla. 1994). In its second opinion, the court wholly rejected application of a trademark balancing test to the right of publicity, and instead applied a copyright fair use analysis. Unlike the magistrate, however, the court held that a fair use analysis requires recognition of a parody exception to the Oklahoma publicity rights statute, and issued a declaratory judgment in favor of Cardtoons. This appeal followed.

## II.     Jurisdiction

MLBPA contends that the district court lacked jurisdiction over this case because there is no federal question, and because the suit does not involve a case or controversy.  Whether this lawsuit involves a federal question, and whether a case or controversy exists, are separate inquiries.  We turn to these questions below.

## A.     Federal Question Jurisdiction

MLBPA first contends that the district court lacked federal subject matter jurisdiction over this case.  We review this threshold question de novo.  United States ex rel. General Rock & Sand Corp. v. Chuska Dev. Corp.,  55 F.3d 1491, 1492 (10th Cir. 1995).  The Declaratory Judgment Act does not confer jurisdiction upon federal courts, Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671 (1950); Chandler v. O'Bryan, 445 F.2d 1045, 1054 (10th Cir. 1971), cert. denied, 405 U.S. 964 (1972), so the power to issue declaratory judgments must lie in some independent basis of jurisdiction.  Here, in the absence of any pleading that invokes diversity jurisdiction, the relevant basis is federal question jurisdiction under 28 U.S.C. § 1331.

District courts have original federal question jurisdiction over complaints that contain a claim that arises under federal law.  28 U.S.C. § 1331.  In actions for declaratory judgment, however, the position of the parties is often reversed:

the plaintiff asserts a defense to an anticipated action by the declaratory judgment defendant. It is the character of the impending action, not the plaintiff's defense, that determines whether there is federal question jurisdiction. Public Serv. Comm'n v. Wycoff Co., 344 U.S. 237, 248 (1952). Thus, federal question jurisdiction exists in a declaratory judgment action if the potential suit by the declaratory judgment defendant would arise under federal law. Mobil Oil Corp. v. City of Long Beach, 772 F.2d 534, 539-40 (9th Cir. 1985); see Franchise Tax Bd. v. Construction Laborers Vacation Trust, 463 U.S. 1, 19 & n.19 (1983).

Accordingly, federal question jurisdiction in this case turns on whether there would be federal question jurisdiction over the well-pleaded complaint that MLBPA may bring against Cardtoons. The federal cause of action at issue here is a claim under section 43(a)(1) of the Lanham Act, which provides civil liability for any person who uses any "word, term, name, symbol, or device" in connection with goods or services that is likely to cause confusion "as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1). We evaluate the adequacy of the MLBPA's federal claim by the same standard that we would use to evaluate federal question jurisdiction if that claim were actually before us. See Janakes v. United States Postal Serv., 768 F.2d 1091, 1093-95 (9th Cir. 1985). Dismissal of

a complaint for lack of subject matter jurisdiction would only be justified if "that claim were 'so attenuated and unsubstantial as to be absolutely devoid of merit' or 'frivolous.'" Baker v. Carr, 369 U.S. 186, 199 (1962) (citations omitted). This case clearly survives that test: MLBPA could have brought a nonfrivolous Lanham Act claim against Cardtoons alleging that Cardtoons' use of the names and likenesses of major league baseball players on its cards was likely to cause confusion as to the association of MLBPA with Cardtoons or as to MLBPA's approval of the cards. Because MLBPA could have brought a federal Lanham Act claim as part of a well-pleaded complaint against Cardtoons, the district court had federal question jurisdiction over this declaratory judgment action.

Cardtoons maintains, and the district court agreed, that the court also had jurisdiction over this action because it involves substantial First Amendment questions. This assertion is incorrect. It is well settled that we look to the nature of the anticipated claims of the declaratory judgment defendant, not the anticipated defenses by the declaratory judgment plaintiff, to determine the presence of a federal question. Wycoff, 344 U.S. at 248. "'[I]f, but for the availability of the declaratory judgment procedure, the federal claim would arise only as a defense to a state created action, jurisdiction is lacking.'" Franchise Tax Bd., 463 U.S. at 16 (quoting 10A Charles A. Wright et al., Federal Practice and Procedure § 2767, at 744-45 (2d ed. 1983)). In this case, the First

Amendment arises only as a potential <u>defense</u> to MLBPA's claimed right: MLBPA could neither bring an action based on the First Amendment nor assert a well-pleaded state claim that necessarily involved a First Amendment question. Thus, we cannot ground our jurisdiction on this basis because "the First Amendment as a defense does not constitute a basis for federal jurisdiction, for it is fundamental that anticipation of a defense cannot confer jurisdiction." <u>Monks v. Hetherington</u>, 573 F.2d 1164, 1166 (10th Cir. 1978).

**B.      The Controversy Requirement**

MLBPA further contends that this suit does not involve a case or controversy. We review this issue de novo. <u>Federal Express Corp. v. Air Line Pilots Ass'n</u>, 67 F.3d 961, 964 (D.C. Cir. 1995); <u>see</u> <u>New Mexico Env't Dep't v. Foulston</u>, 4 F.3d 887, 888-89 (10th Cir. 1993), <u>cert. denied</u>, 114 S. Ct. 1372 (1994). Federal courts may only decide cases or controversies, U.S. Const. art. III, § 2, a requirement that is no less strict in an action for a declaratory judgment than in any other type of suit, <u>Altvater v. Freeman</u>, 319 U.S. 359, 363 (1943). Indeed, the requirement is reflected in the Declaratory Judgment Act, which limits application of the remedy to cases of "actual controversy." 28 U.S.C. § 2201(a).

In order to satisfy this threshold requirement, there must be "a real and substantial controversy admitting of specific relief through a decree of a

- 12 -

conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 241 (1937). In an intellectual property case, an actual controversy exists when (1) the declaratory plaintiff has produced or is prepared to produce the product in question and (2) the declaratory defendant's conduct has created a reasonable apprehension on the part of the declaratory plaintiff that it will face suit if it commences or continues the activity at issue. Spectronics Corp. v. H.B. Fuller Co., 940 F.2d 631, 634 (Fed. Cir.) (patent), cert. denied, 502 U.S. 1013 (1991); Texas v. West Publishing Co., 882 F.2d 171, 175 (5th Cir. 1989) (copyright), cert. denied, 493 U.S. 1058 (1990); Indium Corp. v. Semi-Alloys, Inc., 781 F.2d 879, 883 (Fed. Cir. 1985) (trademark), cert. denied, 479 U.S. 820 (1986). The declaratory plaintiff bears the burden of establishing the existence of a controversy by a preponderance of the evidence. Texas v. West Publishing Co., 882 F.2d 171, 175 (5th Cir. 1989), cert. denied, 493 U.S. 1058 (1990).

Cardtoons has carried its burden by establishing both elements of the case or controversy test. The first element is satisfied because Cardtoons had completed all work in preparation for production of the cards when it filed its declaratory judgment complaint. The second element is satisfied by MLBPA's cease and desist letter in which it threatened to pursue its "full legal remedies" if Cardtoons did not immediately stop production and sale of the cards. That letter,

along with MLBPA's history of suing other card companies in similar situations, e.g., <u>Major League Baseball Players Ass'n v. Dad's Kid Corp.</u>, 806 F. Supp. 458 (S.D.N.Y. 1992), created a reasonable apprehension on the part of Cardtoons of impending litigation.

MLBPA argues that Cardtoons could not have reasonably feared a <u>federal</u> claim because MLBPA never explicitly threatened to bring a Lanham Act claim. As discussed above, whether MLBPA's potential suit could contain a federal claim is pivotal to our federal question jurisdiction. Whether MLBPA threatened to bring a federal claim, however, is immaterial to the controversy requirement, which is satisfied so long as MLBPA's conduct created a reasonable apprehension on the part of Cardtoons of the imminence of suit, with state or federal claims, upon publication. In any event, Cardtoons was reasonably apprehensive of a suit containing a federal claim given MLBPA's threat of pursuing its "<u>full</u> legal remedies" and its previous use of the Lanham Act in similar cases. Thus, the dispute between Cardtoons and MLBPA satisfies the case or controversy requirement.

## III. The Merits

Cardtoons asks for a declaration that it can distribute its parody trading cards without the consent of MLBPA. There are three steps to our analysis of this issue. First, we determine whether the cards infringe upon MLBPA's property rights as established by either the Lanham Act or Oklahoma's right of publicity statute. If so, we then ascertain whether the cards are protected by the First Amendment. Finally, if both parties have cognizable rights at stake, we proceed to a final determination of the relative importance of those rights in the context of this case.

### A. MLBPA's Property Rights

### 1. The Lanham Act

We begin by determining whether the cards violate MLBPA's property rights under the Lanham Act. Section 43(a)(1) of the Lanham Act, 15 U.S.C. § 1125(a)(1), creates a federal remedy for false representations or false designations of origin used in connection with the sale of a product. The statute provides civil liability for:

> (a)(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--

> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, . . . .

The hallmark of a Lanham Act suit is proof of the likelihood of confusion, which occurs "when consumers make an incorrect mental association between the involved commercial products or their producers." San Francisco Arts & Athletics, Inc. v. United States Olympic Comm., 483 U.S. 522, 564 (1987) (Brennan, J., dissenting), quoted with approval in Jordache Enters., Inc. v. Hogg Wyld, Ltd., 828 F.2d 1482, 1484 (10th Cir. 1987).

Likelihood of confusion is a question of fact that we review for clear error. Jordache, 828 F.2d at 1484. The district court found that Cardtoons' parody cards created no likelihood of confusion. We agree that no one would mistake MLBPA and its members as anything other than the targets of the parody cards. Most of the cards have a Cardtoons logo and a statement that they are not licensed by MLBPA. In addition, as with all successful parodies, the effect of the cards is to amuse rather than confuse. "A parody relies upon a difference from the original mark, presumably a humorous difference, in order to produce its desired effect." Id. at 1486 (emphasis added). Cardtoons' success depends upon the humorous association of its parody cards with traditional, licensed baseball cards, not upon public confusion as to the source of the cards. The district court's decision that

the parody cards do not create a likelihood of confusion is not clearly erroneous, and thus the cards do not infringe upon MLBPA's property rights under the Lanham Act.

2.      **The Right of Publicity**

The right of publicity is the right of a person to control the commercial use of his or her identity.  1 J. Thomas McCarthy, The Rights of Publicity and Privacy § 1.1[A][1] (1996); see Restatement (Third) of Unfair Competition § 46 (1995). While the right was originally intertwined with the right of privacy, courts soon came to recognize a distinction between the personal right to be left alone and the business right to control use of one's identity in commerce.  McCarthy, supra, §§ 1.1-1.6; Michael Madow, Private Ownership of Public Image: Popular Culture and Publicity Rights, 81 Cal. L. Rev. 127, 167-78 (1993).  The latter was first acknowledged as a distinct privilege and termed the "right of publicity" in Haelan Laboratories, Inc. v. Topps Chewing Gum, Inc., 202 F.2d 866 (2d Cir.), cert. denied, 346 U.S. 816 (1953).  Haelan Laboratories, appropriately enough, involved two rival chewing gum manufacturers who were arguing over exclusive rights to use the image of a professional baseball player to promote their product. In resolving the dispute, the court concluded that "a man has a right in the publicity value of his photograph."  Id. at 868.  The court explained:

> This right might be called a "right of publicity." For it is common knowledge that many prominent persons (especially actors and ballplayers), far from having their feelings bruised through public exposure of their likenesses, would feel sorely deprived if they no longer received money for authorizing advertisements, popularizing their countenances, displayed in newspapers, magazines, busses, trains and subways. This right of publicity would usually yield them no money unless it could be made the subject of an exclusive grant which barred any other advertiser from using their pictures.

Id. The development of this new intellectual property right was further cultivated by Melville Nimmer in his seminal article The Right of Publicity, 19 Law & Contemp. Probs. 203 (1954). Nimmer, who was counsel for Paramount Pictures at the time, Madow, supra, at 174 n.238, referred to "the needs of Broadway and Hollywood" in describing the foundations and parameters of the right, Nimmer, supra, at 203. The right of publicity is now recognized by common law or statute in twenty-five states. McCarthy, supra, § 6.1[B].

Like trademark and copyright, the right of publicity involves a cognizable property interest. Zacchini v. Scripps-Howard Broadcasting Co., 433 U.S. 562, 573 (1977); Restatement (Third) of Unfair Competition § 46 cmt. g. Most formulations of the right protect against the unauthorized use of certain features of a person's identity--such as name, likeness, or voice--for commercial purposes. See McCarthy, supra, §§ 4.9-4.15. Although publicity rights are related to laws preventing false endorsement, they offer substantially broader protection. Suppose, for example, that a company, Mitchell Fruit, wanted to use pop singer

Madonna in an advertising campaign to sell bananas, but Madonna never ate its fruit and would not agree to endorse its products. If Mitchell Fruit posted a billboard featuring a picture of Madonna and the phrase, "Madonna may have ten platinum albums, but she's never had a Mitchell banana," Madonna would not have a claim for false endorsement. She would, however, have a publicity rights claim, because Mitchell Fruit misappropriated her name and likeness for commercial purposes. Publicity rights, then, are a form of property protection that allows people to profit from the full commercial value of their identities.

Oklahoma first recognized the right of publicity as early as 1965, but expanded the right in a 1985 statute that is virtually identical to California's right of publicity statute, Cal. Civ. Code §§ 990 and 3344. The heart of the Oklahoma statute provides that:

> Any person who knowingly uses another's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods, or services, without such persons prior consent, . . . shall be liable for any damages sustained by the person or persons injured as a result thereof, and any profits from the unauthorized use that are attributable to the use shall be taken into account in computing the actual damages.

Okla. Stat. tit. 12, § 1449(A). Thus, a civil suit for infringement of MLBPA's publicity right under § 1449(A) requires proof of three elements: (1) knowing use of player names or likenesses (2) on products, merchandise, or goods (3) without

MLBPA's prior consent. If MLBPA proves these three elements, then the burden shifts to Cardtoons to raise a valid defense.

There is little question that Cardtoons knowingly uses the names and likenesses of major league baseball players. This is evident from an examination of the cards and the testimony of the president of Cardtoons, who conceded that the cards borrow the likenesses of active players. Indeed, the caricatures are only humorous because they, along with the parodied name, team, and commentary, are accurate enough to allow identification of the players being parodied. The second and third elements of the statute are also satisfied. The cards are clearly a product, designed to be widely marketed and sold for profit. In addition, the parties have stipulated that MLBPA has not consented to Cardtoons' use of player likenesses. Cardtoons' parody cards, then, do infringe upon MLBPA's publicity right as defined in § 1449(A).

The Oklahoma publicity statute contains two exceptions designed to accommodate the First Amendment. The first, a "news" exception, exempts use of a person's identity in connection with any news, public affairs, or sports broadcast or account, or any political campaign, from the dictates of the statute. Okla. stat. tit. 12, § 1449(D). The second exception, roughly analogous to the First Amendment concept of "incidental use," exempts use in a commercial medium that is not directly connected with commercial sponsorship or paid

advertising. Okla. stat. tit. 12, § 1449(F). The news and incidental use exceptions, however, provide no haven for Cardtoons. Cardtoons' commercial venture is not in connection with any news account. Moreover, the company's use of player likenesses is directly connected with a proposed commercial endeavor; indeed, the players were specifically selected for their wide market appeal. Thus, notwithstanding any First Amendment defense, Cardtoons' use of player likenesses on its cards violates the Oklahoma statute and infringes upon the property rights of MLBPA.

**B.      Cardtoons' First Amendment Right**

Because the parody trading cards infringe upon MLBPA's property rights, we must consider whether Cardtoons has a countervailing First Amendment right to publish the cards. The First Amendment only protects speech from regulation by the government. Although this is a civil action between private parties, it involves application of a state statute that Cardtoons claims imposes restrictions on its right of free expression. Application of that statute thus satisfies the state action requirement of Cardtoons' First Amendment claim. See New York Times Co. v. Sullivan, 376 U.S. 254, 265 (1964).

Cardtoons' parody trading cards receive full protection under the First Amendment. The cards provide social commentary on public figures, major

league baseball players, who are involved in a significant commercial enterprise, major league baseball. While not core political speech (the cards do not, for example, adopt a position on the Ken Griffey, Jr., for President campaign), this type of commentary on an important social institution constitutes protected expression.

The cards are no less protected because they provide humorous rather than serious commentary. Speech that entertains, like speech that informs, is protected by the First Amendment because "[t]he line between the informing and the entertaining is too elusive for the protection of that basic right." Winters v. New York, 333 U.S. 507, 510 (1948); see Zacchini, 433 U.S. at 562, 578. Moreover, Cardtoons makes use of artistic and literary devices with distinguished traditions. Parody, for example, is a humorous form of social commentary that dates to Greek antiquity, and has since made regular appearances in English literature. See L.L Bean, Inc. v. Drake Publishers, Inc., 811 F.2d 26, 28 (1st Cir.), appeal dismissed and cert. denied, 483 U.S. 1013 (1987). In addition, cartoons and caricatures, such as those in the trading cards, have played a prominent role in public and political debate throughout our nation's history. See Hustler Magazine v. Falwell, 485 U.S. 46, 53-55 (1988). Thus, the trading cards' commentary on these public figures and the major commercial enterprise in which they work receives no less protection because the cards are amusing.

MLBPA contends that Cardtoons' speech receives less protection because it fails to use a traditional medium of expression. The protections afforded by the First Amendment, however, have never been limited to newspapers and books. The Supreme Court has relied on the First Amendment to strike down ordinances that ban the distribution of pamphlets, Lovell v. Griffin, 303 U.S. 444, 451-52 (1938), the circulation of handbills, Jamison v. Texas, 318 U.S. 413, 416 (1943), and the display of yard signs, City of Ladue v. Gilleo, 114 S. Ct. 2038, 2044-47 (1994). Moreover, many untraditional forms of expression are also protected by the First Amendment. See, e.g., Texas v. Johnson, 491 U.S. 397 (1989) (flag burning); Schad v. Mount Ephraim, 452 U.S. 61 (1981) (nude dancing); Cohen v. California, 403 U.S. 15 (1971) (wearing a jacket bearing the words "Fuck the Draft"). Thus, even if the trading cards are not a traditional medium of expression, they nonetheless contain protected speech.

Moreover, even if less common mediums of expression were to receive less First Amendment protection (perhaps out of concern for whether they contain any expression at all), trading cards do not fall into that category. Baseball cards have been an important means of informing the public about baseball players for over a century. "Trading, collecting and learning about players are the most common reasons for children to purchase baseball cards. . . . They are, in other words, an education in baseball." Fleer Corp. v. Topps Chewing Gum, Inc., 501

- 23 -

F. Supp. 485, 495-96 (E.D. Pa. 1980), rev'd on other grounds, 658 F.2d 139 (3d Cir. 1981), cert. denied, 455 U.S. 1019 (1982). In addition, non-sports trading cards have also been an important medium for disseminating information. Some recent examples feature topics such as saints, Norman Rockwell paintings, presidential candidates, the rise and fall of the Soviet Union, local police officers, and Rodney King. All of these trading cards, regardless of their topic, convey information about their subject and therefore constitute an important means of expression that deserves First Amendment protection.

MLBPA also maintains that the parody trading cards are commercial merchandise rather than protected speech. However, we see no principled distinction between speech and merchandise that informs our First Amendment analysis. The fact that expressive materials are sold neither renders the speech unprotected, Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 761 (1976), nor alters the level of protection under the First Amendment, Lakewood v. Plain Dealer Publishing Co., 486 U.S. 750, 756 n.5 (1988). Cardtoons need not give away its trading cards in order to bring them within the ambit of the First Amendment. See Lakewood, 486 U.S. at 756 n.5.

MLBPA further argues that the parody cards are commercial speech and should therefore receive less protection under the First Amendment. The

Supreme Court has defined commercial speech as "expression related solely to the economic interests of the speaker and its audience." Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n, 447 U.S. 557, 561 (1980). Speech that does no more than propose a commercial transaction, for example, is commercial speech. See Virginia State Bd. of Pharmacy, 425 U.S. at 762. Thus, commercial speech is best understood as speech that merely advertises a product or service for business purposes, see 44 Liquormart, Inc. v. Rhode Island, 116 S. Ct. 1495, 1504 (1996) (plurality opinion) (outlining a brief history of commercial speech that is, essentially, a history of advertising). As such, commercial speech may receive something less than the strict review afforded other types of speech. Id. at 1507.

Cardtoons' trading cards, however, are not commercial speech--they do not merely advertise another unrelated product. Although the cards are sold in the marketplace, they are not transformed into commercial speech merely because they are sold for profit. Virginia State Bd. of Pharmacy, 425 U.S. at 761. Contrary to MLBPA's argument, therefore, the cards are unlike the parody in the only other circuit court decision addressing the constitutional tensions inherent in a celebrity parody, White v. Samsung Electronics America, Inc., 971 F.2d 1395 (9th Cir.), cert. denied, 508 U.S 951 (1992). In that case, defendant Samsung published an advertisement featuring a costumed robot that parodied Vanna White, the letter-turner on television's Wheel of Fortune, and White sued for

violation of her right of publicity. The court noted that in cases of noncommercial parodies, "the first amendment hurdle will bar most right of publicity actions against those activities." Id. at 1401 n.3. However, without engaging in a methodical commercial speech analysis of Samsung's First Amendment defense, the court ruled that White's claim was sufficient to withstand Samsung's motion for summary judgment. We disagree with the result in that case for reasons discussed in the two dissents that it engendered. Id. at 1407-08 (Alarcón, J., concurring in part and dissenting in part); White v. Samsung Elecs. Am., Inc., 989 F.2d 1512, 1512-23 (9th Cir. 1993) (denial of rehearing en banc) (Kozinski, J., dissenting). Moreover, our case is distinguished by the fact that the speech involved is not commercial, but rather speech subject to full First Amendment protection. White, therefore, is inapposite, and we must directly confront the central problem in this case: whether Cardtoons' First Amendment right trumps MLBPA's property right.

**C.     Balancing Free Speech Rights with Property Rights**

In resolving the tension between the First Amendment and publicity rights in this case, we find little guidance in cases involving parodies of other forms of intellectual property. Trademark and copyright, for example, have built-in mechanisms that serve to avoid First Amendment concerns of this kind. As

discussed above, proof of trademark infringement under the Lanham Act requires proof of a likelihood of confusion, but, in the case of a good trademark parody, there is little likelihood of confusion, since the humor lies in the difference between the original and the parody. The Copyright Act of 1976 contains a similar mechanism, the fair use exception, which permits the use of copyrighted materials for purposes such as criticism and comment. 17 U.S.C. § 107; see Campbell v. Acuff-Rose Music, Inc., 114 S. Ct. 1164 (1994) (applying the fair use exception to parody). Oklahoma's right of publicity statute, however, does not provide a similar accommodation for parody, and we must therefore confront the First Amendment issue directly.

MLBPA urges us to adopt the framework established in Lloyd Corp. v. Tanner, 407 U.S. 551 (1972), in order to reconcile the free speech and property rights at stake in this case. The issue in Lloyd was whether a private shopping center could prevent the distribution of handbills on its premises. The Court focused on the availability of "adequate alternative avenues of communication":

> It would be an unwarranted infringement of property rights to require [the shopping center] to yield to the exercise of First Amendment rights under circumstances where adequate alternative avenues of communication exist. Such an accommodation would diminish property rights without significantly enhancing the asserted right of free speech.

Id. at 567. The Court held that the First Amendment did not require the shopping center to allow distribution of the handbills because the public sidewalks and

- 27 -

streets surrounding the center provided an adequate alternative avenue of communication. Id. at 567-68. This type of analysis, usually applied to time, place, and manner restrictions, has also been applied in several cases where intellectual property rights have conflicted with the right to free expression. E.g., Mutual of Omaha Ins. Co. v. Novak, 836 F.2d 397, 402-03 (8th Cir. 1987) (holding that "Mutant of Omaha," a parody of Mutual of Omaha's logo, constitutes trademark infringement), cert. denied, 488 U.S. 933 (1988); Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd., 604 F.2d 200, 206 (2d Cir. 1979) (holding that the use of Dallas Cowboy Cheerleader uniforms in the film Debbie Does Dallas constitutes trademark infringement).

MLBPA argues that application of the Lloyd analysis requires protection of its proprietary right of publicity. First, MLBPA maintains that there are many ways that Cardtoons could parody the institution of baseball that would not require use of player names and likenesses. Cardtoons could, for example, use generic images of baseball players to poke fun at the game. Second, MLBPA contends that Cardtoons could use recognizable players in a format other than trading cards, such as a newspaper or magazine, without infringing on its right of publicity. MLBPA argues that these alternative means of communication are adequate and, therefore, that we may uphold its property rights without seriously infringing upon Cardtoons' right to free expression.

We find, however, that in the context of intellectual property, Lloyd's "no adequate alternative avenues" test does not sufficiently accommodate the public's interest in free expression. See Rogers v. Grimaldi, 875 F.2d 994, 999 (2d Cir. 1989); Mutual of Omaha Ins. Co., 836 F.2d at 405-06 (Heaney, J., dissenting). Intellectual property, unlike real estate, includes the words, images, and sounds that we use to communicate, and "we cannot indulge in the facile assumption that one can forbid particular words without also running a substantial risk of suppressing ideas in the process," Cohen, 403 U.S. at 26; see San Francisco Arts & Athletics, 483 U.S. at 569-570 (Brennan, J., dissenting). Restrictions on the words or images that may be used by a speaker, therefore, are quite different than restrictions on the time, place, or manner of speech. Rogers, 875 F.2d at 999; see Robert Denicola, Trademarks as Speech: Constitutional Implications of the Emerging Rationales for the Protection of Trade Symbols, 1982 Wisc. L. Rev. 158, 206.

In this case, Cardtoons' expression requires use of player identities because, in addition to parodying the institution of baseball, the cards also lampoon individual players. Further, Cardtoons' use of the trading card format is an essential component of the parody because baseball cards have traditionally been used to celebrate baseball players and their accomplishments. Cardtoons expresses ideas through the use of major league baseball player identities, and

- 29 -

MLBPA's attempts to enjoin the parody thus goes to the content of the speech, not merely to its time, place, or manner. For that reason, the Lloyd test is inapplicable in this case.

This case instead requires us to directly balance the magnitude of the speech restriction against the asserted governmental interest in protecting the intellectual property right. We thus begin our analysis by examining the importance of Cardtoons' right to free expression and the consequences of limiting that right. We then weigh those consequences against the effect of infringing on MLBPA's right of publicity.

**1. The Effect of Infringing Upon Cardtoons' Right to Free Speech**

Cardtoons' interest in publishing its parody trading cards implicates some of the core concerns of the First Amendment. "Parodies and caricatures," noted Aldous Huxley, "are the most penetrating of criticisms." Point Counter Point, ch. 13 (1928); see Hustler Magazine, 485 U.S. at 53-55. A parodist can, with deft and wit, readily expose the foolish and absurd in society. Parody is also a valuable form of self-expression that allows artists to shed light on earlier works and, at the same time, create new ones. Thus, parody, both as social criticism and a means of self-expression, is a vital commodity in the marketplace of ideas.

Parodies of celebrities are an especially valuable means of expression

because of the role celebrities play in modern society. As one commentator explained, celebrities are "common points of reference for millions of individuals who may never interact with one another, but who share, by virtue of their participation in a mediated culture, a common experience and a collective memory." John B. Thompson, Ideology and Modern Culture: Critical Social Theory in the Era of Mass Communication 163 (1990). Through their pervasive presence in the media, sports and entertainment celebrities come to symbolize certain ideas and values. Commentator Michael Madow gives the following example:

> In December 1990, . . . shortly before the outbreak of the Gulf War, a story circulated in Washington that President Bush had boasted to a congressional delegation that Saddam Hussein was "going to get his ass kicked." When reporters pressed Bush to confirm the statement, he did not answer directly. Instead, he hitched up his pants in the manner of John Wayne. Everyone got the point.

Madow, supra, at 128 (footnotes omitted). Celebrities, then, are an important element of the shared communicative resources of our cultural domain.

Because celebrities are an important part of our public vocabulary, a parody of a celebrity does not merely lampoon the celebrity, but exposes the weakness of the idea or value that the celebrity symbolizes in society. Cardtoons' trading cards, for example, comment on the state of major league baseball by turning images of our sports heroes into modern-day personifications of avarice. In order to effectively criticize society, parodists need access to images that mean

something to people, and thus celebrity parodies are a valuable communicative resource. Restricting the use of celebrity identities restricts the communication of ideas.

Without First Amendment protection, Cardtoons' trading cards and their irreverent commentary on the national pastime cannot be freely distributed to the public. Instead, as required by Oklahoma law, the production and distribution of the cards would be subject to MLBPA's consent. The problem with this scheme, as the Supreme Court noted in the context of copyright parody, is that "the unlikelihood that creators of imaginative works will license critical reviews or lampoons of their own productions removes such uses from the very notion of a potential licensing market." Campbell, 114 S. Ct. at 1178. The potential for suppression is even greater in the context of publicity rights because the product involved is the celebrity's own persona. Indeed, the director of licensing for MLBPA testified that MLBPA would never license a parody which poked fun at the players. Thus, elevating the right of publicity above the right to free expression would likely prevent distribution of the parody trading cards. This would not only allow MLBPA to censor criticism of its members, but would also have a chilling effect upon future celebrity parodies. Such a result is clearly undesirable, for "[t]he last thing we need, the last thing the First Amendment will tolerate, is a law that lets public figures keep people from mocking them." White,

989 F.2d at 1519 (Kozinski, J., dissenting).

## 2. The Effect of Infringing Upon MLBPA's Right of Publicity

We now turn to an evaluation of society's interest in protecting MLBPA's publicity right. The justifications offered for the right of publicity fall into two categories, economic and noneconomic. The right is thought to further economic goals such as stimulating athletic and artistic achievement, promoting the efficient allocation of resources, and protecting consumers. In addition, the right of publicity is said to protect various noneconomic interests, such as safeguarding natural rights, securing the fruits of celebrity labors, preventing unjust enrichment, and averting emotional harm. We examine the applicability of each of these justifications to the facts of this case.

The principal economic argument made in support of the right of publicity is that it provides an incentive for creativity and achievement. See, e.g., Zacchini, 433 U.S. at 576-77; Carson v. Here's Johnny Portable Toilets, Inc., 698 F.2d 831, 837 (6th Cir. 1983). Under this view, publicity rights induce people to expend the time, effort, and resources to develop the talents prerequisite to public recognition. While those talents provide immediate benefit to those with commercially valuable identities, the products of their enterprise--such as movies, songs, and sporting events--ultimately benefit society as a whole. Thus, it is

argued, society has an interest in a right of publicity that is closely analogous to its interest in other intellectual property protections such as copyright and patent law. Zacchini, 433 U.S. at 576.

This incentives argument is certainly a compelling justification for other forms of intellectual property. Copyright law, for example, protects the primary, if not only, source of a writer's income, and thus provides a significant incentive for creativity and achievement. The incentive effect of publicity rights, however, has been overstated. Most sports and entertainment celebrities with commercially valuable identities engage in activities that themselves generate a significant amount of income; the commercial value of their identities is merely a by-product of their performance values. See Restatement (Third) of Unfair Competition § 46 cmt. c. Although no one pays to watch Cormac McCarthy write a novel, many people pay a lot of money to watch Demi Moore "act" and Michael Jordan play basketball. Thus, the analogy to the incentive effect of other intellectual property protections is strained because "[a]bolition of the right of publicity would leave entirely unimpaired a celebrity's ability to earn a living from the activities that have generated his commercially marketable fame." Madow, supra, at 209.

This distinction between the value of a person's identity and the value of his performance explains why Zacchini v. Scripps-Howard Broadcasting Corp., 433 U.S. 562 (1977), the Supreme Court's sole case involving a right of publicity

claim, is a red herring. Hugo Zacchini, a performer in a human cannonball act, brought an action against a television station to recover damages he suffered when the station videotaped and broadcast his entire performance. The Supreme Court held that the First Amendment did not give the station the right to broadcast Zacchini's entire act in contravention of his state protected right of publicity. Id. at 574-75. Zacchini, however, complained of the appropriation of the economic value of his performance, not the economic value of his identity. The Court's incentive rationale is obviously more compelling in a right of performance case than in a more typical right of publicity case involving the appropriation of a celebrity's identity. See Restatement (Third) of Unfair Competition § 46 reporters' note cmt. c.

Moreover, the additional inducement for achievement produced by publicity rights are often inconsequential because most celebrities with valuable commercial identities are already handsomely compensated. Actor Jim Carrey, for example, received twenty million dollars for starring in the movie The Cable Guy, see Bernard Weinraub, How a Sure Summer Hit Missed, N.Y. Times, June 27, 1996, at C11, and major league baseball players' salaries currently average over one million dollars per year, see Bill Brashler, Booooooooooooooooo! Let's Hear It for Pampered, Preening, Overpaid Whiners: The Jocks, Chi. Trib., July 28, 1996, (Magazine), at 12. Such figures suggest that "even without the right of

publicity the rate of return to stardom in the entertainment and sports fields is probably high enough to bring forth a more than 'adequate' supply of creative effort and achievement." Madow, supra, at 210. In addition, even in the absence of publicity rights, celebrities would still be able to reap financial reward from authorized appearances and endorsements. The extra income generated by licensing one's identity does not provide a necessary inducement to enter and achieve in the realm of sports and entertainment. Thus, while publicity rights may provide some incentive for creativity and achievement, the magnitude and importance of that incentive has been exaggerated.

The argument that publicity rights provide valuable incentives is even less compelling in the context of celebrity parodies. Since celebrities will seldom give permission for their identities to be parodied, granting them control over the parodic use of their identities would not directly provide them with any additional income. It would, instead, only allow them to shield themselves from ridicule and criticism. The only economic incentive gained by having control over the use of one's identity in parody is control over the potential effect the parody would have on the market for nonparodic use of one's identity. MLBPA claims, for example, that publication of the parody cards will decrease demand for traditional baseball cards because Cardtoons and other makers of parody trading cards would compete with manufacturers of licensed cards in the same limited trading card market.

Parody, however, rarely acts as a market substitute for the original, <u>Campbell</u>, 114 S. Ct. at 1177-78, and there is no evidence in this record that convinces us otherwise. Even if there is some substitutive effect, and card collectors with limited resources decide to buy parody cards instead of traditional, licensed cards, the small amount of additional income generated by suppressing parody cards will have little, if any, effect on the incentive to become a major league baseball player.

The incentives argument would be even more tenuous, indeed perverse, if good-humored celebrities were to license use of their identities for parody. The right of publicity would then provide an incentive to engage in the socially undesirable behavior that might give rise to a reason to parody. Although part of any parody's market appeal depends upon the prominence of the celebrity, the critical element of the parody's value hinges on the accuracy of the caricature or criticism. Society does not have a significant interest in allowing a celebrity to protect the type of reputation that gives rise to parody.

We recognize that publicity rights do provide some incentive to achieve in the fields of sports and entertainment. However, the inducements generated by publicity rights are not nearly as important as those created by copyright and patent law, and the small incentive effect of publicity rights is reduced or eliminated in the context of celebrity parodies. In sum, it is unlikely that little

leaguers will stop dreaming of the big leagues or major leaguers will start "dogging it" to first base if MLBPA is denied the right to control the use of its members' identities in parody.

The second economic justification for the right of publicity is that it promotes the efficient allocation of resources, a version of the familiar tragedy of the commons argument used to prove the superiority of private property over common property. See, e.g., Matthews v. Wozencraft, 15 F.3d 432, 437-38 (5th Cir. 1994). Without the artificial scarcity created by publicity rights, identities would be commercially exploited until the marginal value of each use is zero. Id. "Creating artificial scarcity preserves the value to [the celebrity], to advertisers who contract for the use of his likeness, and in the end, to consumers, who receive information from the knowledge that he is being paid to endorse the product." Id. at 438. Giving people control of the commercial use of their identities, according to this analysis, maximizes the economic and informational value of those identities.

This efficiency argument is most persuasive in the context of advertising, where repeated use of a celebrity's likeness to sell products may eventually diminish its commercial value. The argument is not as persuasive, however, when applied to nonadvertising uses. It is not clear, for example, that the frequent appearance of a celebrity's likeness on t-shirts and coffee mugs will reduce its

value; indeed, the value of the likeness may increase precisely because "everybody's got one." Madow, supra, at 222. Further, celebrities with control over the parodic use of their identities would not use the power to "ration the use of their names in order to maximize their value over time," Matthews, 15 F.3d at 438 n.2. They would instead use that power to suppress criticism, and thus permanently remove a valuable source of information about their identity from the marketplace.

The final economic argument offered for rights of publicity is that they protect against consumer deception. See, e.g., Restatement (Third) of Unfair Competition § 46 cmt. c; McCarthy, supra, § 2.4; Peter L. Felcher & Edward L. Rubin, Privacy, Publicity, and the Portrayal of Real People by the Media, 88 Yale L.J. 1577, 1600 (1979). The Lanham Act, however, already provides nationwide protection against false or misleading representations in connection with the sale of products. Moreover, as discussed above, the use of celebrity names or likenesses in parodies in general, and in Cardtoons' trading cards in particular, are not likely to confuse or deceive consumers. Thus, this final economic justification has little merit.

There are also several noneconomic reasons advanced for the right of publicity. First, some believe that publicity rights stem from some notion of natural rights. McCarthy, for example, argues that a natural rights rationale,

resting more upon "visceral impulses of 'fairness'" than upon reasoned argument, "seems quite sufficient to provide a firm support for the existence of a Right of Publicity." McCarthy, supra, § 2.1[A]. McCarthy, however, offers little reason for this assertion, and blind appeals to first principles carry no weight in our balancing analysis.

The second noneconomic justification is that publicity rights allow celebrities to enjoy the fruits of their labors. See, e.g., Zacchini, 433 U.S. at 573; Uhlaender v. Henricksen, 316 F. Supp. 1277, 1282 (D. Minn. 1970). According to this argument, "[a] celebrity must be considered to have invested his years of practice and competition in a public personality which eventually may reach marketable status." Uhlaender, 316 F. Supp. at 1282. People deserve the right to control and profit from the commercial value of their identities because, quite simply, they've earned it. Thus, in this view, the right of publicity is similar to the right of a commercial enterprise to profit from the goodwill it has built up in its name. Ali v. Playgirl, Inc., 447 F. Supp. 723, 728-29 (S.D.N.Y. 1978).

Celebrities, however, are often not fully responsible for their fame. Indeed, in the entertainment industry, a celebrity's fame may largely be the creation of the media or the audience. See Madow, supra at 184-96 (discussing the role of factors beyond a celebrity's control in developing a commercially marketable persona). As one actor put it, "Only that audience out there makes a

star. It's up to them. You can't do anything about it . . . . Stars would all be Louis B. Mayer's cousins if you could make 'em up." Jack Nicholson, quoted in Jib Fowles, Starstruck: Celebrity Performers and the American Public 84 (1992). Professional athletes may be more responsible for their celebrity status, however, because athletic success is fairly straightforwardly the result of an athlete's natural talent and dedication. Thus, baseball players may deserve to profit from the commercial value of their identities more than movie stars. Once again, however, the force of this justification is diminished in the case of parody, because there is little right to enjoy the fruits of socially undesirable behavior.

The third, related justification for publicity rights is the prevention of unjust enrichment. See, e.g., Zacchini, 433 U.S. at 576; Ali, 447 F. Supp. at 728-29. In this view, whether the commercial value of an identity is the result of a celebrity's hard work, media creation, or just pure dumb luck, no social purpose is served by allowing others to freely appropriate it. Cardtoons, however, is not merely hitching its wagon to a star. As in all celebrity parodies, Cardtoons added a significant creative component of its own to the celebrity identity and created an entirely new product. Indeed, allowing MLBPA to control or profit from the parody trading cards would actually sanction the theft of Cardtoons' creative enterprise.

A final justification offered for the right of publicity is that it prevents

emotional injuries. For example, commercial misappropriation may greatly distress a celebrity who finds all commercial exploitation to be offensive. Lugosi v. Universal Pictures, 603 P.2d 425, 439 n.11 (Cal. 1979) (Bird, C.J., dissenting). Even celebrities who crave public attention might find particular uses of their identities to be distressing. See, e.g., O'Brien v. Pabst Sales Co.,124 F.2d 167, 170 (5th Cir 1942) (professional football player, active in an organization devoted to discouraging alcohol use among young people, sued to stop the use of his image in a Pabst Blue Ribbon beer advertising calendar). The right of publicity allows celebrities to avoid the emotional distress caused by unwanted commercial use of their identities. Publicity rights, however, are meant to protect against the loss of financial gain, not mental anguish. Zacchini, 433 U.S. at 573; Lugosi, 603 P.2d at 438-39 (Bird, C.J., dissenting). Laws preventing unfair competition, such as the Lanham Act, and laws prohibiting the intentional infliction of emotional distress adequately cover that ground. Moreover, fame is a double-edged sword-- the law cannot allow those who enjoy the public limelight to so easily avoid the ridicule and criticism that sometimes accompany public prominence.

Thus, the noneconomic justifications for the right of publicity are no more compelling than the economic arguments. Those justifications further break down in the context of parody, where the right to profit from one's persona is reduced to the power to suppress criticism. In sum, the effect of limiting MLBPA's right

of publicity in this case is negligible.

## IV. Conclusion

One of the primary goals of intellectual property law is to maximize creative expression. The law attempts to achieve this goal by striking a proper balance between the right of a creator to the fruits of his labor and the right of future creators to free expression. Underprotection of intellectual property reduces the incentive to create; overprotection creates a monopoly over the raw material of creative expression. The application of the Oklahoma publicity rights statute to Cardtoons' trading cards presents a classic case of overprotection. Little is to be gained, and much lost, by protecting MLBPA's right to control the use of its members' identities in parody trading cards. The justifications for the right of publicity are not nearly as compelling as those offered for other forms of intellectual property, and are particularly unpersuasive in the case of celebrity parodies. The cards, on the other hand, are an important form of entertainment and social commentary that deserve First Amendment protection. Accordingly, we AFFIRM.

We GRANT the motion by First Amendment Publishing, Inc. for leave to file an amicus curiae brief, DENY the motion by appellee to strike, and GRANT the motion by appellee to file a supplemental appendix and brief in support.