PAUL HARDEMAN, INC., Plaintiff in Error,

v.

Edward Jerry BRADLEY, Defendant in Error.

No. 42772.

Supreme Court of Oklahoma.

May 25, 1971.

As Corrected June 14, 1971.

Rehearing Denied July 20, 1971.

Arnold M. Schwartz, Los Angeles, Cal., and Bonds, Matthews & Mason, Muskogee, for plaintiff in error.

David H. Sanders, Sanders & McElroy, Tulsa, and Andrew Wilcoxen, Wilcoxen, Gephart, Lunn & Mayes, Muskogee, for defendant in error.

WILLIAMS, Justice:

Plaintiff, defendant in error on appeal, filed this suit in the trial court seeking a determination that Paul Hardeman, Inc., plaintiff in error herein, had maliciously interfered with his employment rights which resulted in the diminution of his earning capacity.

In January, 1962, Hardeman as contractor and Dearborn Machinery Movers Company, Inc., as subcontractor entered into a subcontract covering certain work to be performed on the powerhouse at the Eufaula Dam Project, Porum, Oklahoma. Hardeman previously had been selected by the U. S. Army, Corps of Engineers, as the prime contractor on the powerhouse project.

Hardeman and Dearborn began work on the project in May, 1962. Hardeman's superintendent on the project was A. L. Wooten; plaintiff was Dearborn's superintendent.

From the evidence submitted at trial, it appears that on several occasions subsequent to the commencement of construction Hardeman had voiced minor complaints concerning Bradley. These complaints were relative to cluttering the job site with unnecessary tools and debris, improperly by-passing Hardeman's supervisors and communicating directly with the Corps of Engineers, and drilling rivet-holes at a temperature which was improper under the contract specifications. In addition, there allegedly seemed to be a personality clash between Wooten and Bradley.

In August, 1962, Dearborn filed a petition for reorganization under Chapter X, Bankruptcy Act, 11 U.S.C. § 501 et seq., in the U.S. District Court for the Eastern District of Michigan. In September, the U.S. District Court issued its order abandoning and rejecting the Hardeman-Dearborn subcontract pursuant to section 516(1), 11 U.S.C. The facts relative to the subcontract's abandonment and the ensuing problems between Hardeman and United States Fidelity and Guaranty Co., who had issued the surety bonds covering the subcontract, are set forth in our opinion in Paul Hardeman, Inc. v. United States Fidelity and Guaranty Co., No. 42642, Okl., 486 P.2d 726, promulgated simultaneously with this opinion.

Paragraph 13(d) of the Hardeman-Dearborn subcontract provides:

"All supervisory personnel of Subcontractor assigned to the job will be subject to the continuing approval of Contractor. All such personnel not approved by Contractor will be replaced by Subcontractor upon request made by Contractor, and any failure to make such replacement forthwith upon request made

will, at the election of Contractor, be deemed a failure to perform and Contractor may proceed under paragraph 21 hereof."

In summary, paragraph 21 provides that if the subcontractor fails to perform any term, covenant or condition in the contract, contractor may remove subcontractor and take over prosecution of the work without forfeiting any rights contractor may have against the subcontractor or his surety.

Based upon its minor complaints concerning Bradley and representations that the Corps of Engineers had requested Bradley be replaced, Hardeman made several requests of Dearborn and U. S. F. & G. asking the removal of Bradley. Failure to act upon these requests prompted Hardeman to send U. S. F. & G., on November 15, 1962, a telegram, which after quoting the provisions of paragraph 13(d) recited above, stated:

"YOUR CONTINUED FAILURE TO COMPLY WITH OUR VERBAL & CONFIRMING TELEGRAM TO RE-PLACE BRADLEY WILL BE CONSIDERED A BREACH OF THE CONTRACT FOR WHICH YOU ARE NOW RESPONSIBLE. BY CONTINUED FAILURE, WE MEAN YOUR FAILURE TO HAVE TAKEN POSITIVE ACTION IN THIS MATTER BY 12 NOON ON FRIDAY, 11–16–62. NOTHING IN THIS WIRE SHALL CONSTITUTE A WAIVER OF PAUL HARDEMAN'S RIGHTS UNDER THE TERMS OF OUR CONTRACT NO. 811 WITH DMM OR YOUR BOND NO. 35282–12–327–62.

After the abandonment of the subcontract in the reorganization proceeding U. S. F. & G. financed the continuation of the work but the supervision was left to Dearborn's personnel.

On November 16, 1962, U. S. F. & G. and/or Dearborn having refused to remove Bradley and apparently believing the subcontract was terminated, moved its equipment and personnel from the powerhouse job site. The work under the subcontract was completed by Hardeman.

Thereafter, Bradley was sent to Georgia by Dearborn to complete work on another project. Two weeks after the termination of the Hardeman-Dearborn subcontract, he was discharged by Dearborn. There is no evidence in the record relative to why he was discharged.

At the conclusion of trial, the court entered judgment on a jury verdict for plaintiff.

In Paul Hardeman, Inc. v. United States Fidelity and Guaranty Co., No. 42642, Okl., 486 P.2d 726, supra, this date decided, we held the provisions of paragraphs 13(d) and 21 were clear and unambiguous and gave Hardeman the contractual right to request the removal of Bradley and to terminate the subcontract if this request were not granted. In the instant case, plaintiff concedes Hardeman had the legal right under the contract to request his removal from the job. This Court previously has held a threat to exercise a legal right cannot be the basis of an action. Peoples Finance & Thrift Co. v. Harwell, 183 Okl. 413, 82 P.2d 994 (1938). In our view, this reasoning applies equally well in the situation where one not only threatens but does exercise an equal or superior legal right.

In the case of Raycroft v. Tayntor, 68 Vt. 219, 35 A. 53, the Vermont Supreme Court had before it a situation wherein one C. E. Tayntor, a resident of New York, owned a quarry. The defendant, E. M. Tayntor managed the quarry and its 60 to 90 employees, did the hiring, paying and firing, bought supplies and anything needed in the business. A Mr. Libersant got leave from defendant Tayntor to go on the premises and cut poor quality granite for paving stone for an agreed price. "This contract was for no definite period, and was terminable at the pleasure of the defendant. Libersant had the right to leave the work at pleasure. He expected, if no difficulty arose, to continue the work through the winter. The plaintiff came to

work for Libersant by the hour, with an understanding, if they got along together, that he could work through the winter. Either party could end this arrangement at his pleasure."

Thereafter, Raycroft, the plaintiff, purchased some standing trees on a piece of land adjoining the quarry property and later defendant on behalf of C. E. Tayntor purchased the land on which the trees stood in order to acquire a spring thereon for use of the quarry. Defendant also purchased those of the trees not yet cut by plaintiff and left standing around the spring. Plaintiff's testimony was of effect that defendant became very angry with plaintiff over terms of a receipt defendant wanted plaintiff to sign, ordered plaintiff to leave the premises and told plaintiff he would get Libersant to discharge plaintiff. The evidence was of further effect that defendant went to Libersant and asked him to discharge plaintiff; that Libersant told defendant that plaintiff was satisfactory to him and he did not want to let him go. When told repeatedly that he must discharge plaintiff or leave and quit taking stone himself, Libersant finally let plaintiff go.

Plaintiff claimed he could not get as much wages working elsewhere. He sued and got a judgment based upon a favorable verdict. Defendant carried his exceptions to the Supreme Court and the judgment was reversed.

The Vermont Court reviewed and quoted from a number of authorities and concluded as follows:

"On the doctrine of these authorities, cited by the plaintiff, the threatened act of the defendant was one which, in his relation to the business of the quarry and Libersant, he had the legal right to do, and it would violate no superior right of the plaintiff. The court should have ordered the verdict as requested at the close of the evidence. Judgment reversed, and cause remanded."

The record herein does tend to establish that certain Hardeman employees had stat-

ed to U. S. F. & G. and/or Dearborn that the Corps of Engineers wanted Bradley removed and that the officers of the Corps denied making statements of any such effect. However, it is quite obvious this representation had little effect on plaintiff's employers. The latter risked termination and further financial liability under the contract rather than remove Bradley from the project.

As noted above, the record is silent concerning any reason for Bradley's discharge from Dearborn some two weeks after the termination of the Hardeman-Dearborn contract. To surmise it was because of the Hardeman actions, or because of the abandonment of many Dearborn contracts in the reorganization proceedings, or because of any other reason would be pure speculation.

The judgment of the trial court is reversed.

BERRY, C. J., DAVISON, V. C. J., and BLACKBIRD, JACKSON, HODGES & LAVENDER, JJ., concur.