**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 1 1998**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

_____

OKLAHOMA NATURAL GAS COMPANY, a
Division of ONEOK, Inc.,

      Plaintiff-Appellee,

and

CHRIS FIELDS; AREN ALMON, mother of
Baylee Almon, a minor, deceased,

      Plaintiffs-Intervenors,

v.

LESTER E. LARUE,

      Defendant-Appellant.

No. 97-6087
(W.D. Okla.)
(D.Ct. No. CIV-95-1556-C)

OKLAHOMA NATURAL GAS COMPANY, a
Division of ONEOK, Inc.,

      Plaintiff,

and

CHRIS FIELDS; AREN ALMON, mother of
Baylee Almon, a minor, deceased,

      Plaintiffs-Intervenors-Appellants.

v.

LESTER E. LARUE,

      Defendant-Appellee.

No. 97-6093
(W.D. Okla.)
(D.Ct. No. CIV-95-1556-C)

LESTER LARUE,

        Plaintiff-Appellant,

v.

ONEOK, INC., d/b/a Oklahoma Natural Gas
Company,

        Defendant-Appellee.

No. 97-6224
(W.D. Okla.)
(D.Ct. No. CIV-95-1557-C)

## ORDER AND JUDGMENT[*]

Before **BRORBY**, **BARRETT**, and **LUCERO**, Circuit Judges.

After examining the briefs and appellate record, this panel has determined

unanimously that oral argument would not materially assist the determination of

this appeal. *See* Fed. R. App. P. 34(a); 10th Cir. R. 34.1.9. The case is therefore

ordered submitted without oral argument.

This consolidated appeal involves three separate, but related, cases. In the

first case (No. 97-6087), Lester LaRue appeals the district court's grant of partial

---

[*] This order and judgment is not binding precedent except under the doctrines of
law of the case, *res judicata* and collateral estoppel. The court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

-2-

summary judgment for Oklahoma Natural Gas Company (the Company) deciding the Company was the copyright owner of certain photographs, and its decisions on several matters concerning the related non-jury trial on the Company's copyright violation claim against him. In the second case (No. 97-6093), Chris Fields and Aren Almon, intervenors in the Company's suit against Mr. LaRue, appeal the district court's adverse decisions concerning their claims against Mr. LaRue under Oklahoma's right of publicity statutes. And in the third case (No. 97-6224), Mr. LaRue appeals the district court's denial of his two motions to remand his wrongful discharge suit to state court and its grant of summary judgment for the Company on that suit. We affirm the district court on the first two cases and reverse on the third.

These cases all stem from the bombing that destroyed the Alfred P. Murrah Building in Oklahoma City, Oklahoma, on April 19, 1995. The Company is a natural gas utility that serves Oklahoma City. On April 19, 1995, Mr. LaRue was employed by the Company as the Safety Coordinator for its Oklahoma City district. As Safety Coordinator, it was part of Mr. LaRue's job to investigate explosions and take photographs of the scene.

Mr. LaRue was in his office when the explosion destroyed the Murrah

Building. Thinking the explosion may have been due to a natural gas leak, Mr. LaRue drove to the scene in a company vehicle to investigate. Once at the scene, he began taking photographs with a camera and film supplied by the Company. He took photographs of the overall scene, as well as of company crews shutting off gas lines. During this time, Mr. LaRue also assisted company crews by watching for dangerous overhead debris and by locating and shutting off gas lines. At least once, he reported in to the Company's command center at the scene.

At one point, while preparing to photograph a company crew going into a basement area to rescue victims, Mr. LaRue noticed a firefighter cradling an injured infant. He took a photograph of the two, which became the well-known "firefighter and baby" photograph at the heart of this dispute.[1]

The day after the explosion, Newsweek magazine approached Mr. LaRue regarding the possible publication of some of his photographs. Mr. LaRue informed his supervisor at the Company, Samuel Combs, of Newsweek's interest in the photographs. The next day, he contracted with Newsweek for publication

---

[1] Ownership of a photograph of the damaged building, taken by Mr. LaRue that morning, is also disputed.

of two of the photographs, including the "firefighter and baby" picture that was on the magazine's May 1, 1995, cover.[2] Mr. Combs warned Mr. LaRue that the sale of the photographs could constitute a violation of the Company's conflict of interest rules.

On April 25, 1995, Mr. LaRue entered into a contract with Sygma, a clearinghouse for photographs, granting it worldwide syndication rights to the photographs. According to the contract, the photographs were to be distributed with the credit "Lester (Bob) LaRue/Sygma." The Company did not initially object to Mr. LaRue's sale of the photographs; however, it did claim ownership of them on May 18, 1995. The "firefighter and baby" photograph continues to be widely used as a result of Mr. LaRue's contract with Sygma.

Without the Company's permission, Mr. LaRue contracted for the manufacture and sale of T-shirts with the "firefighter and baby" depicted on the front. Because of objections expressed by the baby's mother, Ms. Almon, none of the T-shirts were ever marketed to the public. Also, Mr. LaRue contracted with a company, Westwind, to produce bronze-like statutes depicting the firefighter

_____

[2] Another photographer, Chuck Porter, also captured the "firefighter and baby" scene in a photograph that later won the Pulitzer Prize.

-5-

holding the baby. About 700 copies of the statue were sold or otherwise distributed.

On June 8, 1995, Mr. LaRue filed an application to register his claim of copyright to many of the photographs he took on the morning of April 19. In early July, the Company filed application to register claim of copyright to two of the photographs – the "firefighter and baby" and one of the building minutes after the explosion.

In late April 1995, a Company Senior Vice President, Charles Hopper, discussed with Mr. LaRue the possible conflict of interest[3] in selling the photographs for personal gain. On May 1, 1995, the Company President, David Kyle, discussed the conflict of interest situation with Mr. LaRue. Mr. Kyle sent Mr. LaRue a letter claiming the Company's ownership of the photographs on May

---

[3] The Company has a conflict of interest policy that requires all employees to "avoid any situation or activity that involves, or may appear to involve, a conflict between the employee's personal interests (financial or otherwise) and the interests of the Company." Termination of employment is one of the disciplinary actions explicitly provided for by the policy.

Company officials apparently did not mind publication of the photographs, but they were concerned with appearance should Mr. LaRue or the Company profit from such publication. The potential public relations damage that might result from one of its employees profiting from the bombing disaster created the conflict of interest.

18, 1995. On September 6, 1995, Mr. Hopper and Mr. Combs informed Mr. LaRue he had two days to acknowledge the Company's ownership of the photographs, transfer any rights he may have to the Company, and pay over all proceeds to benefit the bombing victims, or he would be terminated. Mr. LaRue refused this demand and was terminated on September 8, 1995.

### *Copyright Dispute, No. 97-6087*

On October 5, 1995, the Company filed an action against Mr. LaRue in federal district court claiming copyright ownership of the photographs of the Oklahoma City bombing scene. The Company sought a determination of copyright ownership, damages for infringement, an accounting of the money already paid to Mr. LaRue for use of the photographs, and an injunction preventing Mr. LaRue from future use of the photographs.[4] After full briefing, the district court granted the Company partial summary judgment, holding that it was the copyright owner. The district court then held a non-jury trial to resolve the remaining issues. Following the trial, the district court entered a Memorandum Opinion and Order in which it enjoined Mr. LaRue from future use

---

[4] The Company filed an amended complaint on October 10, 1995, adding an additional claim for copyright infringement for Mr. LaRue's use of the "firefighter and baby" photograph to create, manufacture and market statues of the scene.

of the copyrighted photographs in violation of the Company's copyright and assessed $34,623.50 in damages.[5]

On appeal, Mr. LaRue raises four issues: (1) whether the district court erred in granting summary judgment for the Company because material facts were disputed; (2) whether the district court erred in failing to enforce its finding of a non-exclusive license; (3) whether the district court erred in its calculation of damages; and (4) whether the district court erred in denying Mr. LaRue a jury trial.

In support of his first issue on appeal – that the district court erred in granting summary judgment for the Company because material facts were disputed – Mr. LaRue raises three points, which we will address in turn. We review the grant of summary judgment *de novo*, applying the same well-recognized legal standard used by the district court pursuant to Federal Rule of Civil Procedure 56(c). *See Kaul v. Stephan*, 83 F.3d 1208, 1212 (10th Cir. 1996). We examine the record in the light most favorable to the nonmoving party. *See*

---

[5] The court alternatively assessed $34,623.50 in actual damages and $17,311.75 in statutory damages for each of the two copyright infringed (for a total of $34,623.50). The Company opted to recover the statutory damages.

*Thomas v. IBM*, 48 F.3d 478, 484 (10th Cir. 1995).

First, Mr. LaRue argues his certificate of registration, which constitutes *prima facie* evidence of his ownership, creates a genuine issue of material fact precluding resolution of the ownership question on summary judgment. Mr. LaRue is correct that his certificate of registration creates a presumption in his favor, but it does not necessarily follow that such a presumption precludes resolution of the ownership issue on summary judgment.

"In any judicial proceedings the certificate of registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c). Once a party produces a registration certificate, the burden of disputing the validity of the copyright shifts to the other party. *See Autoskill, Inc. v. National Educ. Support Sys., Inc.*, 994 F.2d 1476, 1487 (10th Cir.), *cert. denied*, 510 U.S. 916 (1993). There is no reason, however, that such a burden cannot be met at the summary judgment stage in an appropriate case. *See S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1086 (9th Cir. 1989) ("The presumptive validity of the certificate may be rebutted and defeated on summary judgment.").

This is just such an appropriate case. Overwhelming evidence demonstrates Mr. LaRue was acting within the scope of his employment as he took the photographs in question, including: taking photographs was part of his job; it was during work hours; he used a company camera and film; the Company paid to develop the film; he reported in to the Company throughout the day; and he never told anyone he was taking personal time. The district court properly focused on application of the work made for hire doctrine, through which the Company was entitled to ownership of the copyrights. Mr. LaRue's certificate of registration does not establish any presumptions that would alter the work made for hire analysis, and as such, cannot create a genuine issue as to any material fact.

Second, Mr. LaRue argues questions he raised concerning the validity of the Company's copyright registrations should have precluded summary judgment. The district court did not need to reach this issue because it found the Company, by operation of the work made for hire doctrine, owns the copyright. *See Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989) (describing work made for hire doctrine). As we are unpersuaded by Mr. LaRue's argument concerning the work made for hire doctrine, see below, we too need not address the validity of the Company's copyright registrations.

Third, Mr. LaRue argues genuine issues of material fact exist concerning whether the work made for hire doctrine applies to him.[6]  Specifically, he refers to a point in Mr. Kyle's deposition where he stated:  "I don't see anything in [the cover of May 1, 1995, Newsweek Magazine] that relates directly to the business of Oklahoma Natural Gas Company."  This argument is preposterous.  The photograph discussed in the quote, the Newsweek cover, is a small part of the actual photograph taken by Mr. LaRue, which was cropped and enlarged.  Mr. Kyle's failure to see anything directly relating to the business of the Company in a small part of only one photograph from a whole series of photographs hardly creates a genuine issue of material fact concerning the application of the work made for hire doctrine.  Furthermore, Mr. LaRue provides no support for his implied assertion that a photograph must "directly relate" to the business of the employer to qualify under the work made for hire doctrine.

Because Mr. LaRue has not demonstrated on appeal the existence of any genuine issues of material fact, we affirm the district court's grant of summary

_____

[6] Mr. LaRue's counsel seems to suggest there is a wealth of contested material facts concerning whether the photographs were taken within the scope of Mr. LaRue's employment with the Company, yet he only points to the one quote discussed in the text.  It is not the court's job to advocate for his client.  If there are grounds for reversal in the record, counsel needs to address them with specificity in the brief.

judgment on the question of the copyright ownership.[7]

In support of his second issue on appeal – that the district court erred in failing to enforce its finding of a non-exclusive license – Mr. LaRue argues the district court made all the findings necessary to establish a grant of a non-exclusive license. In light of this license, Mr. LaRue contends, the district court erred in holding him liable for infringement.

The district court decided the question of infringement after trial. The court found:

> Despite the fact that [the Company] authorized [Mr.] LaRue's publication of the photographs, this authorization was given only on the condition, in the first instance that it not constitute a conflict of interest, and later that profits go to charity. Because [Mr.] LaRue published the photograph and contracted for its publication in violation of that conditional permission, the publication and contracting regarding the photographs constitute infringement.

Therefore, the district court explicitly found Mr. LaRue violated the terms of any

---

[7] Mr. LaRue does not contest the district court's legal conclusion that the work made for hire doctrine applies. He only contends disputed facts preclude such a decision on summary judgment.

Also, concluding this section, Mr. LaRue's counsel states genuine issues of material fact existed concerning "the issue of estoppel raised by [Mr.] LaRue in opposition to the motion." This point does not appear to be discussed anywhere in the section.

non-exclusive license, if one did in fact exist.[8]  Mr. LaRue does not address this finding in his brief.

"Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."  Fed. R. Civ. P. 52(a); *Salve Regina College v. Russell*, 499 U.S. 225, 232 (1991). Findings are "clearly erroneous" when "on the entire evidence [we are] left with the definite and firm conviction that a mistake has been committed."  *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948).

Mr. LaRue argues the Company did not express any desire to limit publication of the photographs or to require donation of the publication proceeds to charity[9] until he met with the Company's President, Mr. Kyle, on May 1, 1995,

---

[8]  It is important to note the district court did not express itself in terms of an exclusive or non-exclusive license.  Mr. LaRue attempts to construct an implicit finding of a license by the district court out of its discussion of the Company's agreement to publication in Newsweek.  We do not have to decide if the district court did, in fact, find the existence of a license, because we agree with the district court that Mr. LaRue's use of the photographs exceeded any permission given by the Company.

[9]  In several places, Mr. LaRue argues he complied with the terms of the Company's requests because he contributed "significant" funds to charity.  Although the term "significant" is subject to a range of interpretation, we do not think contributions totaling $4,209.60 out of income totaling $38,305.15 is "significant," or in compliance

a week after publication of the Newsweek issue.[10]  Furthermore, he argues no time limit was imposed on the requirement that he donate the proceeds to charity.[11]

A review of the record supports the district court's finding that Mr. LaRue's publication of the photographs violated any conditional permission given by Company officials.  The Company clearly gave permission for publication of the photographs in Newsweek, and they do not complain of that publication.  When Mr. LaRue entered into the contract with Newsweek, he listed the Company on the rights agreement.  No facts produced by Mr. LaRue, however, support his claim that he is personally entitled to the proceeds from the Newsweek publication.

It is clear that supervisors warned Mr. LaRue from the outset that any

---

with the Company's requests.

[10]  His argument focuses on the Newsweek contract and ignores his actions on the Sygma contract after Mr. Kyle advised him of the requirements.

[11]  At the conclusion of this section, Mr. LaRue's argument shifts to one based on estoppel.  Mr. LaRue does not expound on this theory, and we agree with the district court's finding that facts of this case do not support application of the doctrines of estoppel or latches.

publication of the photographs would be subject to the Company's conflict of interest policy. Mr. LaRue's immediate supervisor, Mr. Combs, discussed the issue with Mr. LaRue several times. A Senior Vice President, Mr. Hopper, met with Mr. LaRue and discussed the possible conflict of interest in personally selling the photographs. The Company President, Mr. Kyle, also met with Mr. LaRue and discussed the conflict of interest.

These conclusions indicate the Company's strong interest in controlling publication of the photographs. Mr. LaRue's claims to the contrary, a review of the record does not demonstrate any clear error on the part of the district court in finding Mr. LaRue exceeded any authority granted him by the Company to publish the photographs.

In support of his third issue on appeal – that the district court erred in its calculation of damages – Mr. LaRue argues the district court improperly limited his deductions from income in calculating the damages. Mr. LaRue argues the district court should have deducted income taxes from his gross income because he was not a willful infringer. Also, he argues the court should have given him credit for his payments to charity.

The Copyright Act provides for two types of damages: actual (the infringer's profits less appropriate deductible expenses) and statutory (any sum in the Court's discretion from $500 to $20,000). 17 U.S.C. § 504. The district court calculated each independently and allowed the Company to elect between the two.[12] The Company elected to take statutory damages. The statutory damages amounted to $17,311.75 for each of the two photographs.

On review of a statutory damages award, we grant the district court wide discretion. *See F.W. Woolworth Co. v. Contemporary Arts, Inc.*, 344 U.S. 228, 232 (1952). The amount awarded for each infringement fell within the statutory range. The district court based its statutory damages determination on "the comparative position[s] of the parties and all of the facts and circumstances." It is clear the district court evaluated the factors and did not believe Mr. LaRue should receive credit for the income taxes or the charitable deductions.[13] Nothing

---

[12] The district court set the same amount of damages under each category, $34,623.50, but it did not explicitly adopt its actual damages calculations in its statutory damages determination.

[13] Had the Company elected actual damages, Mr. LaRue's point concerning the deductibility of income taxes would merit some attention. This Circuit has not decided the question, but the Second Circuit has determined a non-willful copyright infringer is entitled to deduct from its gross revenues taxes paid on profits, for purposes of calculating actual damages, overruling the case cited by the district court in its opinion. *See In Design v. K-Mart Apparel Corp.*, 13 F.3d 559, 567 (2d Cir. 1994).

in Mr. LaRue's brief or the record convinces us these determinations were an abuse of discretion.

In support of his fourth issue on appeal – that the district court erred by holding a non-jury trial – Mr. LaRue argues the issues presented to the court during the non-jury trial were the type of issues a jury should decide.

Mr. LaRue waived his right to a jury. Federal Rule of Civil Procedure 38 provides that a party "may demand a trial by jury of any issue triable of right by a jury by ... serving upon the other parties a demand therefor in writing at any time after the commencement of the action and not later than 10 days after the service of the last pleading directed to such issue." Fed. R. Civ. P. 38(b). The rule further provides "[t]he failure of a party to serve and file a demand ... constitutes a waiver by the party of trial by jury." Fed. R. Civ. P. 38(d).

The last pleading directed to the suit between the Company and Mr. LaRue for the purpose of this rule was Mr. LaRue's answer to the Company's amended complaint. *See In re Kaiser Steel Corp. (Kaiser Steel Corp. v. Frates)*, 911 F.2d 380, 388 (10th Cir. 1990) ("The 'last pleading directed to such issue' will generally be an answer or reply ... and is determined on a claim by claim basis.").

Mr. LaRue filed his answer on October 30, 1995. He did not request a jury trial until December 8, 1995, a full twenty-nine days after the deadline set by Rule 38. The last pleading directed to the suit between the intervenors and Mr. LaRue for the purpose of this rule was Mr. LaRue's answer to the intervenors complaint. Mr. LaRue filed that answer on August 5, 1996. He did not request a jury trial with respect to the intervenors' claims until September 18, 1996, thirty-four days after the deadline.

Mr. LaRue contends his December 8, 1995, jury demand was timely because it was filed before the last pleading concerning the intervenors. We disagree. The caption demonstrates the demand applies only to the Company (the court did not grant the motion to intervene until March 14, 1996. Rule 38 applies to "issues" not cases. Fed. R. Civ. P. 38(b) ("may demand a trial by jury of any issue triable of right by a jury" and "not later than 10 days after the service of the last pleading directed to such issue"). The December 8 jury demand applied to a different party and addressed different issues than those implicated by the pleadings related to the intervenors' claims.[14] If Mr. LaRue had wanted a jury

_____

[14] By order of the district court, the intervenors were not allowed to participate in the ownership and infringement issues in the copyright case. Furthermore, the intervenors' claims were based on state statutes unrelated to the Company's claims.

trial on the issues raised by the intervenors, he should have filed a timely jury demand on those issues. Mr. LaRue did not file a timely jury demand on either the issues in the Company's suit against him or the issues in the intervenors' suit against him.

Mr. LaRue also effectively consented to a non-jury trial. On November 29, 1995, Mr. LaRue's counsel signed, and filed with the district court, a joint status report indicating the case was set for a non-jury trial. After the scheduling conference, the district court issued a scheduling order setting the case for a non-jury trial.

Federal Rule of Civil Procedure 39(b) provides that "notwithstanding the failure of a party to demand a jury in an action in which such a demand might have been made of right, the court in its discretion upon motion may order a trial by jury of any or all issues." As noted above, Mr. LaRue filed a Motion for Jury Trial. Although Mr. LaRue did not refer to Rule 39 in that motion, we will read it as though it was a motion pursuant to Rule 39.

District courts should grant Rule 39(b) motions for a jury trial absent strong and compelling reasons to the contrary. *See Nissan Motor Corp. v. Burciaga*, 982

F.2d 408, 409 (10th Cir. 1992).  However, inadvertence in not making a timely jury demand by the moving party is a proper reason to deny a Rule 39(b) motion. *Id.*  Mr. LaRue provides no explanation for the delay in making his initial jury demand and the dely in filing his Rule 39(b) motion.[15]  Considering the repeated indications that this was scheduled to be a non-jury trial – the joint status report and the district court's scheduling order – we can see no reason other than inadvertence for failing to make a Rule 39(b) motion until a few weeks before the scheduled trial.[16]  Accordingly, the district court did not abuse its discretion in denying Mr. LaRue's motion.

For the foregoing reasons, we affirm the district court's resolution of the Company's suit against Mr. LaRue.

### *Intervenors' Claims, No. 97-6093*

On November 9, 1995, Ms. Almon, the mother of the child, Baylee Almon,

---

[15]  Giving Mr. LaRue's counsel the benefit of the doubt, he could be arguing the delay was not a product of inadvertence because he believed the December jury demand to be timely.  We cannot accept this argument.  The district court's scheduling order, issued well after the December jury demand, clearly indicates the case was set for a non-jury trial.  Therefore, counsel was on notice the December jury demand was insufficient.

[16]  The case was set for trial in October, but the trial did not actually take place until December.

in the "firefighter and baby" photograph, and the firefighter, Mr. Fields, moved to intervene in the Company's copyright suit against Mr. LaRue. The district court granted the motion and the intervenors filed a complaint stating a claim against Mr. LaRue based on Oklahoma's right of publicity statutes, Okla. Stat. tit. 12, §§ 1448 and 1449. Following a trial to the court, the district court ruled the intervenors were not entitled to recover under the statutes.

On appeal, the intervenors raise six issues: (1) the district court erred in finding the state right of publicity statute requires an identifiable plaintiff; (2) the district court erred in finding the child's likeness did not have commercial value before her death; (3) the district court erred in finding the intervenors were not entitled to recover other than for Mr. LaRue's financial gain; (4) the district court erred in finding the intervenors had to show the unauthorized publication was the sole cause of their injuries; (5) the district court erred in finding newsworthiness was perpetual; and (6) the district court erred in finding the picture to be newsworthy.

Two Oklahoma statutes protect the rights of publicity of living and

deceased individuals.[17]  Okla. Stat. tit. 12, §§ 1448 (deceased) and 1449 (living).

"The right of publicity is the right of a person to control the commercial use of

his or her identity."  *Cardtoons v. Major League Baseball Players Ass'n*, 95 F.3d

959, 967 (10th Cir. 1996).  Differing from the right of privacy, or the right to be

left alone, the right of publicity provides the ability "to control use of one's

identity in commerce."  *Id.*

Assuming the Oklahoma statutes are applicable to this situation, § 1448

would control Ms. Almon's claim, as her child is deceased, and § 1449 would

control Mr. Field's claim.  The unauthorized use alleged by Ms. Almon and Mr.

---

[17]  The statutes apply generally to:

> Any person who uses a deceased personality's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods, or services, without prior consent from the person or persons [authorized by the statute to give consent] ....

Okla. Stat. tit. 12, § 1448.

> Any person who knowingly uses another's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods, or services, without such person's prior consent ....

Okla. Stat. tit. 12, § 1449.

Field's is, of course, a photograph. For an action to be based on a photograph, the statutes require the person at issue in the photograph to be "readily identifiable." Okla. Stat. tit. 12, §§ 1448(I) and 1449(B). "A person shall be deemed to be readily identifiable from a photograph when one who views the photograph with the naked eye can reasonably determine that the person depicted in the photograph is the same person who is complaining of its unauthorized use."[18] Okla. Stat. tit. 12, § 1449(B)(1).

The district court ruled the intervenors' claims were not actionable under the Oklahoma statutes because Ms. Almon's child and Mr. Fields were not "readily identifiable" from the photograph. The district court did not explain its interpretation of the term "readily identifiable," but it did support its determination by noting Mr. Fields was identified "only because his station number was clearly displayed, enabling, through questioning of others from Station No. 5, a determination of who had held a baby at the bomb site that day" and that the identity of the child "could not be discerned by anyone other than her mother and family, and, from the testimony, not immediately and conclusively

---

[18] Section 1448 establishes a comparable standard: "A deceased personality shall be deemed to be readily identifiable from a photograph when one who views the photograph with the naked eye can reasonably determine who the person depicted in the photograph is." Okla. Stat. tit. 12, § 1448(I).

-23-

even by them."

The intervenors make three arguments in support of their contention this ruling by the district court was error. The district court's interpretation of the Oklahoma statutes presents a question of law, which we review *de novo. See Salve Regina College*, 499 U.S. at 231. The court's findings of fact shall be set aside only if clearly erroneous. Fed. R. Civ. P. 52(a).

First, the intervenors argue the district court's decision was wrong because "[n]either the [s]tatute nor [the caselaw] hold that an element of the cause of action is whether the person is readily identifiable." As the section of the statute quoted above shows, this argument is groundless. The case cited by the intervenors, *Cardtoons*, did not involve the use of photographs, and as such did not implicate the "readily identifiable" language in the statute. *Cardtoons*, 95 F.3d at 962-63.

Second, the intervenors contend the district court's finding was based on an incorrect assumption that the statute requires viewers to know the name of, or recognize, the individual depicted in the photograph. Also, they contend Ms. Almon's child and Mr. Fields were, in fact, "readily identifiable."

It is not clear from a reading of the district court's opinion that the court based its decision on an assumption the statute requires the person in the photograph to be recognizable apart from the photograph, as the intervenors suggest, although it is certainly possible.  Because it is possible the district court's decision is premised on a misreading of the statute, as we explain below, we will not defer to its application of the facts to the law.  Rather, we will consider for ourselves whether the individuals depicted in the photograph are "readily identifiable."

The court agrees with the intervenors that the "readily identifiable" requirement in the statute does not necessitate that the person depicted in the photograph be widely known or recognized.  By their language, the statutes require only that a person viewing the photograph be able to readily recognize the plaintiff as the individual depicted in the photograph.  *See* Okla. Stat. tit. 12, § 1449(B)(1) ("reasonably determine that the person depicted in the photograph is the same person who is complaining").  We take this to mean, for example, a person viewing the photograph should be able to easily pick out from a group the individual depicted.  The "readily identifiable" requirement definitely does not mean the individual depicted in the photograph must be widely known or generally known to the public.

The intervenors argue the "readily identifiable" requirement should not act to bar their claims because there is no question the photograph depicts a firefighter and a baby and the parties have stipulated that the firefighter is Mr. Fields and the baby is Ms. Almon's child. The question is not, however, whether the individuals depicted in the photograph are Mr. Fields and the child; the relevant question is whether the individuals are "readily identifiable" as Mr. Fields and the child. Based on our review of the copies of the photograph in the record, we do not believe either individual in question is "readily identifiable." Appendix to Appellant's Opening Brief, Vol. I of V at 220; Appellee's Supplemental Appendix at 145.

There is no way to reasonably determine the identity of child depicted in the photograph. Her face is completely obscured. A person viewing the photograph could not provide any sort of description of the child depicted, other than her hair color and approximate size. Indeed, one could not even reasonably say whether the child depicted in the photograph is a male or female. The district court found from the testimony that even the child's family could not identify her as the child in the photograph "immediately and conclusively." Comparing the photograph in question to another photo of the same child in the record proves to be of no assistance. The child is not readily identifiable.

-26-

There also is no way for a person viewing the photograph with the naked eye to readily discern the identity of the firefighter depicted in the photograph. The firefighter is looking down and to the side, at the child in his arms. Most of his face is covered in the shadow formed by his helmet. It appears he may have a moustache, but that too may be a shadow. It is clear the firefighter is a white male, but other than that, there are no distinguishing qualities or characteristics to the firefighter in the photograph. A dispatcher with the fire department who viewed the photograph on the night of the explosion, and who knows Mr. Fields well, thought the firefighter depicted looked like Mr. Fields, but could not identify him conclusively. Significant in the identification was the station number "5" on the helmet – the dispatcher knew only three individuals, including Mr. Fields, wore similar helmets. Given the knowledge that the firefighter depicted in the photograph could only be one of three individuals, the dispatcher, who knew Mr. Fields well, was still so uncertain in his identification that he called Mr. Fields at the station for verification. The lack of distinguishing qualities or characteristics in the firefighter depicted in the photograph prevent him from being "readily identifiable."

Third, the intervenors argue Mr. Fields and the child were "readily identifiable" because they were identified in captions accompanying published

copies of the photograph. We disagree. The statutes explain exactly what is meant by "readily identifiable." Okla. Stat. tit. 12, §§ 1448(I) and 1449(B)(1). Those explanations make no provision for captions. We will not assume the Oklahoma legislature intended to include in its explanation of "readily identifiable" something so far outside the scope of the explicit explanation of the term provided in the statute.

Because we find the Oklahoma right of publicity statutes inapplicable, we need not address the remaining issues raised by the intervenors, which would be relevant only if the statues applied.

While we lament some of the uses to which this photograph was put and we certainly can sympathize with Ms. Almon's distress at seeing this picture of her child so often, we do not believe the Oklahoma right of publicity statutes are applicable. The statutes were designed to protect the right of individuals to control the commercial use of their identities. *See Cardtoons*, 95 F.3d at 967. This photograph, however, could be of any firefighter and any baby. It happens to be of Mr. Fields and Baylee Almon, but neither is readily identifiable, and as such, neither warrants protection from the commercial use of their identity. We affirm the district court's disposition of these claims.

*Wrongful Termination, No. 97-6224*

On September 15, 1995, Mr. LaRue filed a petition alleging state-law causes of action for wrongful termination against the Company in the District Court of Oklahoma County, Oklahoma.[19] The Company removed the case to federal district court pursuant to 28 U.S.C. § 1441, claiming Mr. LaRue's actions arose under the Copyright Act. Mr. LaRue moved for remand. On March 14, 1996, the district court denied his motion, stating "[a]ll causes of action stated by plaintiff depend on ownership of the photographs for determination." Because the district court believed it had exclusive jurisdiction over the copyright ownership question, it refused to remand the case to state court.

The Company moved for summary judgment. While the motion for summary judgment in this action was pending, the district court granted summary judgment on the question of ownership in the copyright case involving the same parties. Mr. LaRue then filed a second Motion for Remand. The district court denied this motion and granted summary judgment for the Company.

---

[19] Mr. LaRue dropped two of his causes of action during the litigation before the district court. Consequently, the remaining two causes of action – extortion and public policy – are the only ones we consider on appeal.

On appeal, Mr. LaRue raises three issues concerning the district court's disposal of his wrongful termination claim: (1) whether the court erred in denying his first motion to remand; (2) whether the court erred in denying his second motion to remand (filed after resolution of the copyright case); and (3) whether the district court erred in granting summary judgment against him. Because we remand on the first issue, we do not reach the other two.

Mr. LaRue argues the district court should have granted his first motion to remand because construction of the Copyright Act is incidental to his claims. Removal is an issue of statutory construction, therefore, we review denials of remand requests *de novo*. *See Pittsburg & Midway Coal Mining Co. v. Yazzie*, 909 F.2d 1387, 1393 (10th Cir.), *cert. denied*, 498 U.S. 1012 (1990).

"Removability depends on whether the action arises under the Constitution or law of the United States." *Crow v. Wyoming Timber Prods. Co.*, 424 F.2d 93, 95 (10th Cir. 1970). The statute covering removal to federal courts provides, in relevant part: "Any civil action of which the district courts have original jurisdiction founded on a claim or right *arising under* the Constitution, treaties or laws of the United States shall be removable without regard to the citizenship or residence of the parties." 28 U.S.C. § 1441(b) (emphasis added). "Arising

under" means the claimed federal right "must be an essential element of the plaintiff's cause of action."[20]  *Crow*, 424 F.2d at 95.

By law, federal district courts have original jurisdiction over any civil action arising under the Copyright Act.  *See* 28 U.S.C. § 1338(a).  Significantly, that jurisdiction is exclusive.  *Id.*  The question we must answer, then, is whether Mr. LaRue's wrongful discharge claims arose under the Copyright Act.

Many years ago, the Second Circuit articulated the now well accepted criteria for determining when a claim arises under the Copyright Act.  *See T.B. Harms Co. v. Eliscu*, 339 F.2d 823, 828 (2d Cir. 1964), *cert. denied*, 381 U.S. 915 (1965).

> [A]n action "arises under" the Copyright Act if and only if the complaint is for a remedy expressly granted by the Act, ... or asserts a claim requiring construction of the Act, ... or, at the very least and perhaps more doubtfully, presents a case where a distinctive policy of the Act requires that federal principles control the disposition of the claim.

---

[20]  There are any number of explanations of the meaning of "arising under."  *See, e.g., Gully v. First Nat'l Bank in Meridian*, 299 U.S. 109 (1936) ("The right or immunity must be such that it will be supported if the Constitution or laws of the United States are given one construction or effect, and defeated if they receive another.") (Cardozo, J.); *American Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260 (1916) ("A suit arises under the law that creates the action.") (Holmes, J.).

*Id.* The district court's decision was premised on the apparent necessity of construing the Act in order to decide Mr. LaRue's case. We disagree.

In its order justifying removal, the district court determined Mr. LaRue could not prevail on his wrongful termination claims if he could not prove ownership of the copyrights to the photographs. Because it considered an essential element of his claims to be proof of ownership under the Copyright Act, the district court found his claims "arose under" the Copyright Act. The district court refused to remand the case, finding it had exclusive jurisdiction pursuant to § 1338(a).

One of Mr. LaRue's claims was based on extortion – he alleges the Company committed extortion by requiring him to sign over his rights or lose his job. Oklahoma law defines extortion as "the obtaining of property from another with his consent, induced by a wrongful use of force or fear, or under color of official right." Okla. St. tit. 21, § 1481. Noting that under Oklahoma law, exercising one's legal right cannot be the basis of an extortion-type action, *see Paul Hardeman, Inc. v. Bradley*, 486 P.2d 731, 733 (Okla. 1971), the district court decided the claim would fail if the Company owned the copyright. The other of Mr. LaRue's claims was based on public policy. Under Oklahoma law,

-32-

an employer cannot terminate an employee for exercising a legal right or interest.

*See Tate v. Browning-Ferris, Inc.*, 833 P.2d 1218, 1225 n.24 (Okla. 1992).  The

district court determined this public policy claim arose under the federal law

because it was either based implicitly on the extortion claim, or that the right Mr.

LaRue claimed to be exercising was his ownership to the copyright.

Mr. LaRue's counsel has done a poor job of articulating his client's

position.[21]  No doubt this led to some confusion on the part of the district court.

---

[21]  Counsel for Mr. LaRue made this case harder, rather than easier, to decide in favor of his client.

At one point in his rambling discourse on this issue, Mr. LaRue's counsel cites three cases to support his contention that a dispute over copyright ownership does not arise under the Copyright Act.  *See  Hanna-Barbera Prod., Inc. v. Screen Gems-EMI Music, Inc.*, 829 F. Supp. 67 (S.D.N.Y. 1993); *Topolos v. Caldewey*, 698 F.2d 991 (9th Cir. 1983); *T.B. Harms Co.*, 339 F.2d at 823.  These cases are inapposite, however, because they all deal with construction of a contract conferring ownership, not construction of the Copyright Act.  In this case, Mr. LaRue and the Company did not have a contract establishing ownership of the photographs, so resort to the work for hire provision of the Copyright Act is necessary.  *See* 17 U.S.C. § 101(1).  This critical distinction should have been clear.

At another point, Mr. LaRue's counsel argues the petition "at best makes but a meager reference to any copyright in providing a historical chain of events supporting his wrongful termination claim."  This is a misrepresentation.  Fourteen of the thirty-one numbered paragraphs in Mr. LaRue's state petition involve the copyright to the photographs.  In paragraph three, Mr. LaRue claims the photographs were personal.  In paragraph five, he discusses his retention of a copyright attorney.  In paragraphs six and seven, he discusses his application for a copyright.  In paragraphs eight and nine, he states the Company never applied for a copyright and never contested his application.  In paragraph ten, he claims the Company was aware he had retained a copyright attorney.  In

We think Mr. LaRue's claims do not arise under the Copyright Act because actual ownership is immaterial to his claims.

With respect to the extortion claim, the property at stake is Mr. LaRue's *claim* to ownership of the photographs.[22] At the point the Company made its demands, actual ownership of the photographs was undecided. Therefore, Mr. LaRue's claim had some value – which is exactly why the Company was demanding he turn over any rights he may have. Mr. LaRue alleged the Company threatened him with the loss of his job in order to coerce him into signing over any rights he may have had. The value of his claim of ownership at that time is unaffected by whether it ultimately turned out to be well or ill founded (although,

---

paragraphs twelve, eighteen, twenty, and twenty-one, Mr. LaRue frames his statements on the assumption he has property rights in the photographs. In paragraph twenty-seven, he contends the Company should have legally pursued its available rights under the Copyright Act. In paragraphs twenty-eight and twenty-nine, he states "[he] has a clear and legally cognizable right to ownership of the photographs" and that his "termination was clearly contrary to [his] legally cognizable rights."

However, counsel's most egregious mistake is never explaining the "legal right" his client was fired for attempting to exercise.

[22] The critical distinction here is between ownership and claim to ownership. The court could not resolve a claim of extortion based on copyright ownership to the photographs without resort to the Copyright Act. However, Mr. LaRue had a claim to ownership regardless of the ultimate resolution of the question. It is that claim Mr. LaRue alleges the Company extorted.

as we now know, it was ill-founded).  Therefore, to the extent Mr. LaRue might have a valid state claim for wrongful termination based on extortion, its resolution does not hinge on construction of the Copyright Act.

With respect to the public policy claim, the legal interest at stake is Mr. LaRue's right to assert ownership of the photographs under the Copyright Act. The Oklahoma courts have created a cause of action for wrongful termination if the discharge is for exercising a legal right or interest.  *See Tate*, 833 P.2d at 1225 n.24.  The Company arguably fired Mr. LaRue because he intended to exercise his right to dispute ownership of the photograph in court, as provided by federal law. In other words, he was exercising his right to dispute ownership under the Copyright Act, not his right of ownership under the Act.  Clearly, he has a right to dispute ownership whether he ultimately prevails on that issue or not. Construction of the Copyright Act is not required to resolve this claim.

Because Mr. LaRue's state wrongful termination claims did not "arise under" the Copyright Act, the district court did not have jurisdiction to consider them and it should have granted Mr. LaRue's motion to remand.  Oklahoma's courts are in a far better position to determine whether the Mr. LaRue's claims satisfy Oklahoma law.

The Company argues Mr. LaRue's claims were properly removed to federal court because they were completely preempted by the Copyright Act. The complete preemption doctrine permits removal to federal court of a state law cause of action "on the theory that federal preemption makes the state law claim 'necessarily federal in character.'" *Schmeling v. NORDAM*, 97 F.3d 1336, 1339 (10th Cir. 1996) (quoting *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 63-64 (1987)). As we have explained, Mr. LaRue's claims ultimately have little to do with the Copyright Act. They are based on state law theories designed to protect employees from improper actions by employers. Because Mr. LaRue's claims stand or fall independently of whether he is the copyright owner, we believe this preemption argument merits no discussion. No serious claim can be made Mr. LaRue's claims are necessarily federal in character because they are tangential to a copyright ownership dispute.

Therefore, we reverse and remand this case to the district court so it can further remand it to the District Court of Oklahoma County, Oklahoma.

For the reasons stated above, we **AFFIRM** the district court in Nos. 97-

6087 and 97-6093. We **REVERSE** and **REMAND** for remand to the Oklahoma

state court in No. 97-6224.

**Entered by the Court:**

**WADE BRORBY**
United States Circuit Judge
